## Adrian A. Devost v. New Hampshire Electric Coop., Inc.

[349 A.2d 896]

No. 44-75

Present: Barney, C.J., Smith, Daley, Larrow and Billings, JJ.

Opinion Filed December 2, 1975

*Guarino and Bean,* White River Junction, for Plaintiff.

*Andrew R. Field,* Montpelier, for Defendant.

**Barney, C.J.** The plaintiffs Devost own a camp property on Lake Norton in the Town of Norton. It is presently a seasonal dwelling but with conversion to year-round use in prospect. The defendant utility services the area with electricity. The litigation involves the refusal by the utility to extend a line to provide the dwelling with service. The Public Service Board, after hearing, required by order that the service be provided under the monetary terms stated in the filed tariffs of the utility. The appeal is based on the claim of the company that, under that tariff, it has the option of refusing service under certain conditions which it claims pertain here.

The matter began after the plaintiff and his wife purchased a lot for a house in Norton and proceeded to construct a substantial structure 22 by 50 feet containing four bedrooms, a bathroom, a living room, kitchen, dining room, and large porch. The cottage, although first used primarily seasonally, is well constructed and insulated for year-round living.

In early 1971, Mrs. Devost called the home office of the defendant and applied for electric service. She was referred to a Mr. Lawrence Drew, director of the plant department, who took the information, then dispatched the company's foreman, Mr. Chaloux, to the Norton cottage.

After Mr. Chaloux had measured the distance from the last existing electric service to the cottage and reported back to Mr. Drew, he then called Mrs. Devost and stated that based on the necessary new construction distance of 3,900 feet, the defendant would construct the line and install service for regular monthly usage charges plus a construction surcharge of $35.00 a month for five years. The Devosts accepted the offer and said that they would like the service installed as soon as possible. They were given an estimated installation date of within two months.

The Devosts went ahead and had the cottage wired for electricity and for electric heat at a cost of over $1,600.00. They also installed an electric washing machine and refrigerator.

In the fall, no construction had yet taken place, so Mrs. Devost called Mr. Drew. She was then told that with winter coming on, construction was to be deferred until spring. In

June of 1972, another call to Mr. Drew informed her she should call Mr. Chaloux. The foreman told her that as soon as some prior work was completed, the installation would be done sometime in early summer. As the summer wore on, Mrs. Devost called again, only to find that the foreman had been ill and the work held up.

In the late fall of 1972, Mrs. Devost called Mr. Drew again and said she was going to contact the Public Service Board. The defendant cooperative then sent application papers for signature; the Devosts executed them, had them notarized, and returned them. This application called for a monthly surcharge of $30.00 a month for a five-year period. This was agreed to by the Devosts.

In the spring of 1973, Mr. Drew was again contacted, and he assured Mrs. Devost that everything was fine and that the necessary easements for the line over Brown Company land had been obtained. Mrs. Devost met with a new foreman at the lake, Mr. Chaloux having passed away. A meeting with the Brown Company was had and an agreement as to the location of the line arrived at. Mrs. Devost was told then that the line should be installed within three weeks.

Then, on June 8, 1973, Mrs. Devost received a letter from a Mr. John Pillsbury, manager of the defendant utility, saying that it would be too expensive to construct this section of the line based on anticipated revenue, and that therefore, under the general terms and conditions of the company's tariff, the company was exercising its right to reject any application for service. The letter went on to indicate that the company might be willing to consider a special contract whereby the Devosts would assume the costs of the extension by some kind of lump sum payment agreement. At this point the matter went before the Public Service Board for resolution.

The hearing examiner took evidence and made findings of fact, the substance of which are reflected in the statement of facts already set out. Applying the provision of the defendant's tariff as filed with the Public Service Board, the examiner found that the appropriate monthly surcharge was $28.85 per month for five years.

In his findings he also spoke of "offers" by the defendant company to provide electric service, first at $35.00 in 1971,

and second at $30.00 in 1972. He noted that both of those offers were contrary to the provisions of the tariff on file. He remarked on the repeated assurances from company representatives that service would be provided, plus the actions of the Devosts in wiring the house.

His findings were adopted by the Board. Based on them, the order directing installation of electricity at a $28.85 monthly surcharge was issued.

The defendant challenges the order claiming that the Public Service Board ought not to be enforcing oral contracts in the manner of a court of general jurisdiction. Furthermore, the evidence in support of the oral contract is claimed to be insufficient.

The hearing examiner functions as the trier of fact in this kind of case. If there is evidence tending to support his findings, they will, in the ordinary situation, be sustained here, since the evaluation of that evidence is for him. *Re Vermont Electric Power Co.*, 131 Vt. 427, 431, 306 A.2d 687 (1973). It is quite clear that there is such evidence supporting an agreement by the defendant, through its agents, and the Devosts, concerning the furnishing of electric service to their premises.

The examiner and the Board are faulted for dealing with general contract law in deciding this case. It is claimed that the function of the Board is so strictly limited as to make the concerns of general contract law beyond the reach of the tribunal.

At least two answers to this proposition come to mind. The first is that, of necessity, the competency of the Board in a jurisdictional sense encompasses all sorts of contractual concerns, since rates and service agreements, among other matters, are, in effect, contracts between the electric company and the customer subject to special scrutiny by the Board.

The second is that the issue presented by the activities of the electric company's representatives in this case, even if limited in contractual effect, certainly acted as a waiver by the company of certain benefits it had under its tariff, and effectively estopped it from denying its obligation

to provide electric service. The company cannot, after entering into an arrangement with a party who has, in good faith, agreed to terms, then use the terms of tariffs or general orders as a device to escape the burdens of its own arrangement. It has not been made to appear that the Board is requiring anything of the utility company that is not reasonable in view of the utility's own position, or so burdensome as to be an imposition. 30 V.S.A. § 2801.

*The order of the Public Service Board is affirmed.*